Filed 6/2/21  P. v. Rudd CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| THE PEOPLE, | C090782 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF-160001340) |
| v. | |
| DEREK JAMES RUDD, | |
| Defendant and Appellant. | |

This case arises out of an undercover sex crime sting operation in Sutter County. A jury found defendant Derek James Rudd guilty of attempted lewd or lascivious acts upon a child under the age of 14 years (Pen. Code, §§ 664, 288, subd. (a))[1] and two counts of contacting a minor with the intent to commit a sexual offense (§§ 288.3, subd. (a)), 288.4, subd. (b)).  The trial court suspended imposition of sentence and placed

---

[1] Undesignated statutory references are to the Penal Code.

defendant on probation for three years with various terms and conditions, including the condition he serve 364 days in jail. This timely appeal followed.

On appeal, defendant contends the trial court erred in denying his motion to dismiss the charges based on discriminatory prosecution, excluding evidence, and denying his request to use a questionnaire during voir dire. We reject these contentions and affirm the judgment.

**FACTUAL BACKGROUND**

*The Sting Operation*

Operation Underground Railroad (OUR) is a nonprofit organization that works with law enforcement agencies throughout the world to "rescue kids from sex trafficking." Among other things, OUR provides training in undercover sting operations and funding to facilitate those operations, including paying for undercover sting houses.

In 2016, the vice president of OUR, David Stallings, assisted the Sutter County District Attorney's Office (district attorney) in conducting undercover sting operations aimed at catching individuals seeking to sexually exploit minors. As part of those operations, Stallings helped create e-mail accounts and Internet profile pages (e.g., Facebook profile pages) for fictitious "undercover personas." Stallings and investigators with the district attorney posted online advertisements using the undercover personas on various websites, including Craigslist. The undercover persona used in this case was a fictitious 13-year-old boy named Timmy Johnson (Timmy). Timmy's fake profile included an age-regressed photograph of an adult male that was made to look like a 13-year-old boy.

During undercover sting operations in early June 2016, Stallings saw an advertisement in the casual encounters section on Craigslist that caught his attention. The advertisement stated that a 38-year-old bisexual male, later identified as defendant, was

2

seeking a "compact submissive" male that was "smooth young."[2]  The advertisement specifically noted, "If not young, don't reply."  The advertisement included pictures of a man but none of them clearly showed the man's face, and the language of the advertisement did not include any information identifying defendant as the person who had posted it.

Stallings, playing the role of Timmy, responded to defendant's Craigslist advertisement at 1:13 p.m. on June 7, 2016.[3]  He wrote, "[L]uv your ad . . . specially the pics.  im probly 2 young but wanted to give props 4 the ad."  Thereafter, defendant and Timmy exchanged a series of e-mails over the course of the following 10 or so hours.  The e-mail exchange, which was attached to defendant's Craigslist advertisement, was admitted into evidence and provided to the jury.

As relevant to defendant's claims, several hours after Timmy responded to defendant's Craigslist advertisement, defendant replied, "[W]ho says too young?  I like young. [¶]  Picture?  u'd be pleasantly surprised!"  When Timmy responded, he informed defendant that he was 13 years old and "pretty sure" he was "attracted to guys and gay but [was] trying to figure everything out."  Timmy said that his father was not supportive but was never around, and that he would send a "normal" picture because he had sent pictures in the past and "got in trouble."  Defendant answered that he knew what statutory rape was, and assured Timmy that he would not molest him.  Defendant also said that he is a "very good/nice guy," and that people in Timmy's situation "could use more friends."  Timmy sent defendant the age-regressed photograph and noted that it would not be rape if he was "ok wit it."

---

[2]  Stallings testified that the term smooth typically refers to prepubescent, while the terms compact and submissive could be used to describe a child.

[3]  It is not disputed that Craigslist has an anonymous e-mail system that allows people to communicate without revealing their identities.

When Timmy did not respond to defendant's invitation to come over to his house and "just talk," defendant wrote, "So how shall we play this? Kind of intrigued? Maybe cause it's a bit taboo :)" In response, Timmy reminded defendant that he was only 13 years old and said that he had "never done this b4." Timmy also said, "I'm pretty sure I'm gay, but not positive. I'm learning a bit and more curious than b4." Thereafter, defendant acknowledged that he understood that Timmy was 13 years old and, again, invited Timmy to come over to his house to talk. Defendant requested Timmy's address, provided his phone number, and said that he could help Timmy "figure things out." When Timmy did not respond, defendant wrote, "Timmy, I rarely have a peaceful free evening, Ur response was thoughtful, respectful, and I know u r figuring things out, and wish I had someone like me at ur age. If u want to take advantage of it, this is ur chance. I rarely do this . . . so if I don't hear back from u within 15 min, then I'll be signing off. And let's remember, u reached out, and responded to me."

Shortly thereafter, Timmy responded. He said that his father was at work and that he would be home alone until 6:00 a.m. He also said that he thought he knew what he liked but was "afraid of things hurting and bleeding." Several minutes later, Timmy wrote another e-mail stating, "How do I know this won't hurt me too bad? I'm kinda nervous." In response, defendant assured Timmy that he would not "do that kind of thing to [him]" and indicated that they should talk through things first. He also said, "Send me . . . ur address, and we can meet outside for a moment and discuss things. If it's cool with u, I have a very nice house, and after we meet, if u give the go ahead, I think we both will feel most comfortable hanging out in my serene backyard or can go inside and Netflix and chill. [¶] Ur call, but let's get the hardest part out of the way. . . Address and digits? [¶] I'll be driving a new White Lincoln MKC . . . ."

A few minutes later, defendant sent another e-mail that stated, "Babe, I just replied . . . use ur heart and I would NEVER want anything like that. It's my job to catapult u thru the toughest times, u think are hell, and uplift u, give u hope, and make sure u don't

get jaded and believe in the good of man.  [¶] Xo and Wink :)"  When Timmy responded, he indicated that he was not interested in talking; rather, he was "looking to learn about whether this is what [he] like[s] or not," explaining that he could "talk about driving a car all night but until [he does] it [he would not] really know what[] it's like."  Timmy also said that he appreciated defendant being nice to him.

Around 15 minutes later, at 10:19 p.m., defendant wrote, "OK, so long as YOU put it out there, I can't get arrested.  Of course I'm not looking to talk.  I like young, because I like to teach, and the more fresh, Virgin ass the better.  I won't hurt u 'cause I have a tongue that should be patented, and u should know for the future what a real rim job is intended, and should be renamed a Make-out ram job, cause the swirls [o]f my tongue will relax and loosen u, to the point u could never bleed, and be wondering all night between tongue and cock which I will def mix it up, and have u quivering, arching, pillows biting, and sweating until u[] won't know what the word until means. . . .  [¶] I'm an exponentially gifted Top, who hasn't forgotten the art of foreplay!  [¶]  OK.  Put it [o]n the line, now it's up to u to pull the trigger and experience what few only wish they could.  I'll teach you how to teach others.  [¶]  So address plz, and  I'll will be right over to pick you up . . . and ensure ur on ur doorstep by 5:30 a.m., tucked in bed, so no one is the wiser.  [¶]  Boom!  [¶] Drop the address and let's stop the back and forth!"

Around 10 minutes later, Timmy responded, "I'm IN!  If ur really that good u better hurry up and get here!  We only have 7 hours."  Timmy then provided defendant with the address of the sting house.  Defendant immediately replied, "Lol.  On my way. :)"

When defendant knocked on the door of the sting house approximately 30 minutes later,**4** an investigator with the district attorney, Jason Parker, answered the door and

---

**4**  Prior to defendant's arrival at the sting house, he and Timmy exchanged several e-mails.  In one of the e-mails, Timmy stated that defendant must drive like his "grandpa"

pretended to be Timmy's father. Defendant claimed to be a friend of Timmy's and said he was there to "talk about a situation that's going on with school." Shortly thereafter, defendant was arrested, brought into the sting house, and interviewed by Parker. Prior to or after the interview, Parker confirmed defendant's identity by reviewing his identification.

At trial, Stallings testified that he was not aware of defendant's identity prior to his arrest. Parker also testified that he did not learn defendant's identity until after he was arrested. When asked, Parker said that he was not monitoring Stallings's communications with defendant on the night of the sting operation and could not recall being made aware that defendant had given Stallings his phone number. Stallings testified that he did not attempt to identify the person he was communicating with by using the phone number he was given, and that he did not provide the phone number to anyone involved in the sting operation prior to defendant's arrest. When deputy district attorney Clinton Curry testified, he said that he was present during the sting operation and learned of defendant's identity for the first time after defendant was arrested.[5]

*Defendant's Interview*

During his interview with Parker at the sting house, which was played for the jury, defendant admitted that his sexually related communications with Timmy, a boy he

---

because it was taking him a long time to get to his house. At 10:51 p.m., defendant informed Timmy that he had arrived. In response, Timmy said that he just got out of the shower and was getting dressed. Defendant replied, "Then why u bitching, 'Grandma'?? :) [¶] My CFO called, so I had to take it . . . just like u will. Bammm! :) [¶] Hurry up. I only have 6.45 hrs. And that still might not be enuf for u . . . oh hell I went there . . . and there . . . and inside there . . ." At trial, defendant testified that he spoke with his father on the phone, not his CFO, and that he was referencing anal sex when he said that Timmy was going to "take it."

[5] Curry testified that he handled all the sexual assault cases in Sutter County and gave legal advice to the individuals participating in the sting operations (e.g., Stallings), including advice on entrapment.

6

believed was 13 years old, were inappropriate. Defendant also admitted that it was wrong and "illegal" to show up at what he thought was Timmy's house after engaging in the e-mail exchange with Timmy. However, defendant repeatedly insisted that he only wanted to talk to Timmy.

*Defendant's Testimony*

Defendant testified on his own behalf at trial. He explained that he was raised as a Mormon in a very religious household. He struggled with his sexual orientation when he was young and did not reveal he was gay until he was 24 years old. His parents "didn't take it well."

When asked, defendant admitted that he posted the Craigslist advertisement at issue in this case, and that he was not bisexual as the advertisement stated. He also admitted he was the person who exchanged a series of e-mails with Timmy on June 7, 2016, including e-mails that were sexual in nature. However, he insisted that he just wanted to talk with Timmy and was concerned that if he were unable to do so, Timmy was going to have sex with someone else. Defendant explained that the sexually explicit e-mail he sent to Timmy at 10:19 p.m. was his last "Hail Mary" attempt to obtain Timmy's address so he could help Timmy. Defendant claimed that he did not intend to have any sexual relations with Timmy. Defendant also explained that he called his father, Larry Rudd (Larry), after he sent the sexually explicit e-mail to Timmy.[6]

_____

[6] At trial, Larry testified as a defense witness. He said that he spoke with defendant over the phone around 10:00 p.m. on the night of the sting operation. According to Larry, defendant was concerned about a "kid" he was talking to on Facebook who was having "some problems" and a difficult time telling his father he is gay. Larry testified that defendant sounded upset during the call and was afraid that the kid was going to get hurt or something was going to happen to the kid if he "did what he was apparently planning [on doing]." Defendant told Larry that he wanted to talk to the kid and "counsel" him. When Larry advised defendant that he should not get involved and to call the police if there was a problem, defendant said, "I can't do that. You don't call the police on a 10-year old. I will just go take care of it myself."

On cross-examination, defendant admitted that he was the person who appeared in the photographs included in his Craigslist advertisement, and that none of the photographs clearly showed his face. He also admitted that he was 45 years old (not 38) when he posted the advertisement, and that the advertisement did not contain any personally identifying information. When defendant was asked whether he was "looking for smooth, compact and submissive," he said, "That's in the body, an exotic . . . not a freaking kid."

Upon further questioning, defendant acknowledged that he believed Timmy was 13 years old but reiterated that he did not intend on having sexual relations with Timmy; rather, he just wanted to talk to Timmy because he was worried about Timmy's safety and wanted to help him. Defendant claimed that he "forgot" who he was communicating with and "took it too far" when he wrote the sexually explicit e-mail describing the sexual acts he would perform on Timmy (e.g., anal sex). He later claimed that he "panicked" and wrote this e-mail because he thought Timmy would find another person to have sex with if he only wanted to talk to Timmy. Defendant admitted that it was inappropriate to subsequently tell Timmy that Timmy was going to "take it," meaning anal sex.

## DISCUSSION

### I

### *Motion to Dismiss*

Defendant contends the trial court erred in denying his motion to dismiss the charges based on discriminatory prosecution. He argues that dismissal was warranted because District Attorney Amanda Hopper unlawfully targeted him based on his sexual orientation. We conclude the trial court properly denied defendant's motion to dismiss.

A. *Additional Background*

Defendant filed a pretrial motion to dismiss the charges based on discriminatory prosecution. He argued that such relief was warranted because he was singled out for

8

prosecution by Hopper based on his sexual orientation, and other similarly situated individuals were treated differently than he.

As support for his position, defendant primarily relied on a declaration submitted by Parker, the former lead investigator for the district attorney. Defendant asserted that Hopper, who knew defendant because she attended the same church as his parents, instructed Parker in April 2016 to send a friend request to defendant through Facebook using Timmy's fictitious Facebook profile. According to defendant, after Hopper instructed Parker to send the friend request, she made remarks about defendant's sexual orientation. Hopper also laughed and joked about how "gay" defendant is. She described defendant's "flamboyant" behavior to Parker. Defendant further asserted that, after he denied Timmy's Facebook friend request, the prosecution sent another friend request to him using an updated Facebook profile of Timmy, which included a photograph of a rainbow flag, a well-known symbol of gay pride. The prosecution also had Timmy "friend" 10 of defendant's friends on Facebook to create the illusion that he and Timmy shared mutual friends and thus knew each other. Thereafter, defendant accepted Timmy's friend request but did not communicate with Timmy through Facebook.[7] According to defendant, following Hopper's failed attempts to communicate with him through Facebook using Timmy's fake profile, she then sought to "aggressively pursue [him] as a suspect" by communicating with him through his advertisement on Craigslist,[8] even though the advertisement stated he was looking for a " 'young guy,' " not a " 'child,' 'boy,' or '13-year-old.' " Finally, defendant asserted that Hopper, who was present at the sting house, was "jumping up and down in joy" when he was arrested, and

_____

[7] Stallings testified that he was not involved in any of the "Facebook activities" involving defendant. He did not send defendant any friend requests or messages via Facebook.

[8] Defendant's Craigslist advertisement was posted on May 29, 2016.

9

subsequently instructed Parker to edit the video recording of his arrest to remove the portion showing her acting this way.[9]

Defendant argued that these circumstances "provide an easy mechanism for identifying discriminatory purpose *and* discriminatory effect" for purposes of discriminatory prosecution. Defendant insisted that the facts he identified "clearly" demonstrated that "Hopper is prejudiced against homosexuality," that she "orchestrated a sting operation with a malicious intent to entrap homosexual individuals," and that he, as a gay man, "was pursued significantly more aggressively than the heterosexual suspects in the sting operation . . . despite no objective indication he was pursuing underage boys."

The prosecution opposed the motion, arguing that defendant failed to carry his burden to show discriminatory prosecution. To show that defendant was not deliberately singled out for prosecution based on his sexual orientation, the prosecution submitted declarations from four individuals who were present at the sting house on the night of defendant's arrest (e.g., Hopper, Curry), all of whom averred that they had no knowledge of defendant's identity as the person communicating with Stallings (i.e., "Timmy") until defendant arrived at the sting house. The prosecution also pointed to a portion of Parker's preliminary hearing testimony wherein he testified that he did not know defendant was the person communicating with Timmy until defendant arrived at the sting house. In addition, the prosecution submitted evidence to show that the sting operations

---

[9] Parker did not state in his declaration that Hopper instructed him to edit the arrest video. Instead, he stated, "When DA Hopper learned her behavior was recorded on video, she was very nervous and expressed her fear if the video were to be made public." Parker further stated, "I discussed with the prosecutor in charge of the investigation, Clint Curry, my concerns regarding DA Hopper's actions. I was instructed to clip the portion out of the evidence video where DA Hopper ridiculed Derek Rudd. I disagreed with the decision and expressed concern that this was hiding evidence. I was instructed to clip the portion out for the discovery provided to the defense attorney. DA Hopper knew the video portion of her conduct was being removed."

10

did not have a discriminatory effect. Curry stated in his declaration that, "The Craigslist operations conducted in 2016 primarily targeted adult men seeking sex with female children. Efforts were made to target adult men who were seeking sex with male children. An effort was also made to target adult women seeking sex with children, but no leads were ever developed. [¶] [T]he Craigslist sting operations resulted in the arrest of 17 adult men, 14 (or 82%) of whom were seeking sex with an underage female and 3 (or 18%) of whom were seeking sex with an underage male."[10]

As relevant here, the evidence submitted by the prosecution also showed that Curry and Hopper were acquaintances of defendant prior to his arrest, and that Curry instructed Parker to edit the video recording of defendant's arrest so that it only showed the arrest portion at the front door. In Curry's declaration, he explained that he did so because he determined that Hopper's reaction to defendant's arrival at the sting house was not relevant to defendant's guilt or innocence.

At the hearing on defendant's motion to dismiss, the prosecutor acknowledged that the recording showed that Hopper was excited when defendant arrived at the sting house, but argued the reaction was irrelevant to whether the charges should be dismissed for discriminatory prosecution because there was no evidence that Hopper directed Parker to target defendant based on his sexual orientation. In response, the court asked the prosecutor to clarify that: "the charges in this case stem from a Craigslist ad that the defendant posted and that even though there had been a prior Facebook friend request initiated by the District Attorney's office, there had not been communication between defendant and Timmy . . . prior to the Craigslist ad that was posted by defendant." The

---

[10] Curry's declaration also explained, "The Facebook operation resulted in the arrest of 21 men. Three of the men were arrested only for trying to sell marijuana to a minor. The other 18 were arrested for various charges related to their attempts to have sex with a female child."

11

prosecutor agreed and the court added: "Because without that nexus, I'm struggling with the relevance of anything to do with the Facebook reaching out at all. There was a break in time . . . and then there was a period of time where the investigators were looking at ads that were potentially troublesome because they mentioned young individuals, and they were on sites or in the section of Craigslist that was seeking casual encounters and so then communications were started that way." In response, the prosecutor stated that the court's comments go "directly to the heart" of defendant's motion because nobody involved in the sting operation knew that defendant was the person communicating with Timmy (i.e. Stallings) until he arrived at the sting house. Defense counsel, for his part, acknowledged that he could not pinpoint a specific connection between the Facebook friend request Timmy sent to defendant and the decision by Stallings to respond to defendant's Craigslist advertisement, but argued that the circumstances suggested a connection because there was an attempt to target defendant by reaching out to him on Facebook prior to responding to his Craigslist advertisement and the individuals at the sting house recognized him upon his arrival.

The trial court found that there was no evidence showing a discriminatory purpose, noting that the evidence submitted did not establish a link between the Craigslist advertisement and the Facebook friend request. The court further found that there was no evidence of a discriminatory effect, noting that the sting operation statistics "show more heterosexual behavior was prosecuted, . . . men seeking underage females," than "homosexual behavior, men seeking underage . . . boys."

The court directed the parties to jointly review the unedited version of the recording of defendant's arrest and the transcript of the recording. The parties complied with the court's directive and indicated that they had no objection to the court reviewing the recording. The prosecutor stated, and defense counsel did not disagree, that the transcript "fairly reflects what can be heard and understood on the video." The court

12

reviewed the video and determined that the transcript was accurate, and it would consider the recording and transcript in its ruling.

In denying defendant's motion, the trial court concluded that there was no evidence showing a discriminatory effect from the sting operation. The court further concluded that there was no evidence showing that defendant had been deliberately singled out for prosecution based on his sexual orientation.

B. *Applicable Legal Principles*

"In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file . . . , generally rests entirely in his [or her] discretion.' " (*United States v. Armstrong* (1996) 517 U.S. 456, 464 (*Armstrong*); *People v. Lucas* (1995) 12 Cal.4th 415, 477.) "As a result, '[t]he presumption of regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.' " (*Armstrong, supra*, 517 U.S. at p. 464.) However, the People's discretion to prosecute and what to charge is " 'subject to constitutional constraints' " including "the equal protection component of the Due Process clause of the Fifth Amendment." (*Ibid*.)

In order to establish a claim of discriminatory prosecution, " 'the defendant must prove: (1) "that he has been deliberately singled out for prosecution on the basis of some invidious criterion"; and (2) that "the prosecution would not have been pursued except for the discriminatory design of the prosecuting authorities." ' " (*Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 832 (*Baluyut*).) " '[A]n invidious purpose for prosecution is one that is arbitrary and thus unjustified because it bears no rational relationship to legitimate law enforcement interests . . . .' " (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 568-569.)

"Although referred to for convenience as a 'defense,' a defendant's claim of discriminatory prosecution goes not to the nature of the charged offense, but to a defect

13

of constitutional dimension in the initiation of the prosecution. [Citation.] The defect lies in the denial of equal protection to persons who are singled out for a prosecution that is 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' " (*Baluyut, supra*, 12 Cal.4th at p. 831.) The essential elements of the "defense" are discriminatory effect that it was motivated by a discriminatory purpose or intent. (*Armstrong, supra*, 517 U.S. at p. 465; *People v. Superior Court* (*Baez*) (2000) 79 Cal.App.4th 1177, 1189-1190.) "When a defendant establishes the elements of discriminatory prosecution, the action must be dismissed even if a serious crime is charged unless the People establish a compelling reason for the selective enforcement." (*Baluyut, supra*, 12 Cal.4th at p. 831.)

"Unequal treatment which results simply from laxity of enforcement or which reflects a nonarbitrary basis for selective enforcement of a statute does not deny equal protection and is not constitutionally prohibited discriminatory enforcement. [Citations.] However, the unlawful administration by state officers of a state statute that is fair on its face, which results in unequal application to persons who are entitled to be treated alike, denies equal protection if it is the product of intentional or purposeful discrimination." (*Baluyut, supra*, 12 Cal.4th at p. 832.)

"[A]n equal protection violation does not arise whenever officials 'prosecute one and not [another] for the same act' [citation]; instead, the equal protection guarantee simply prohibits prosecuting officials from purposefully and intentionally singling out individuals for disparate treatment on an invidiously discriminatory basis." (*Murgia v. Municipal Court for Bakersfield Judicial Dist*. (1975) 15 Cal.3d 286, 297.)

C. *Analysis*

We conclude the trial court properly denied defendant's motion to dismiss. The record does not reflect that defendant was subjected to a discriminatory prosecution. The evidence submitted in connection with defendant's motion does not show that he was deliberately singled out for prosecution based on his sexual orientation, or that the

14

prosecution would not have been pursued but for the discriminatory design of the prosecuting authorities. In short, defendant did not carry his burden to show a discriminatory effect from the sting operation that was motivated by a desire to single out homosexuals for disparate treatment based on their sexual orientation. Indeed, defendant made *no* effort to show discriminatory effect in the trial court, and the evidence submitted did not show that the prosecution was motivated by a discriminatory intent or purpose. There was no evidence establishing that any of the individuals involved in the sting operation knew defendant had posted the Craigslist advertisement and was the person communicating with Timmy prior to his arrival at the sting house. We find no merit in defendant's passing assertion that, "At a minimum, the issue [of discriminatory prosecution] should have been presented to the jury." (*Murgia v. Municipal Court for Bakersfield Judicial Dist.*, *supra*, 15 Cal.3d at pp. 293-294, fn. 4 ["[B]ecause a claim of discriminatory prosecution generally rests upon evidence completely extraneous to the specific facts of the charged offense, we believe the issue should not be resolved upon evidence submitted at trial, but instead should be raised . . . through a pretrial motion to dismiss"].)

Because we have addressed the merits of defendant's claim, we need not and do not address the People's forfeiture argument.

II

*Video Recording of Defendant's Arrest*

Defendant contends the trial court abused its discretion in excluding a portion of the video recording capturing his arrest. According to defendant, the ruling deprived him from arguing that a witness (Hopper) engaged in conduct that reflected on her believability. We reject this claim.

A. *Additional Background*

The prosecution filed a pretrial motion to exclude a portion of the video recording capturing defendant's arrest. The prosecutor stated that he only intended to introduce the

15

beginning portion of the recording, which showed defendant speaking with Parker at the sting house and then being arrested. The prosecutor requested an order excluding the remainder of the recording, which showed the reaction of Hopper and Stallings "to the identification of the defendant near the time of his arrest." The prosecutor argued that this portion of the recording was inadmissible under Evidence Code sections 210 and 352, because it was irrelevant, and its admission would cause "unfair prejudice."

During a pretrial discussion regarding the defense of entrapment, the prosecutor argued that the comments made by Hopper after defendant's arrest should be excluded under Evidence Code section 352 because they were not relevant to entrapment or any other issue in the case, and, as a result, the evidence "could only . . . inflame the passions of the jury, inflame their prejudices . . . ." The trial court granted the prosecution's request to exclude this evidence. In so ruling, the court found that the comments made by Hopper were not relevant to the defense of entrapment, and that any marginal relevance the evidence had to other issues in the case was outweighed by the prejudicial effect of the evidence within the meaning of Evidence Code section 352.

Prior to closing arguments, the trial court instructed the jury on the defense of entrapment pursuant to CALCRIM. No. 3408.[11] In closing argument, defense counsel

---

[11] The jury was instructed with CALCRIM No. 3408, in relevant part, as follows: "Entrapment is a defense. . . . [¶] A person is entrapped if a law enforcement officer engaged in conduct that would cause a normally law-abiding person to commit the crime. [¶] Some examples of entrapment might include conduct like badgering, persuasion by flattery or coaxing, repeated and insistent requests, or an appeal to friendship or sympathy. [¶] . . . [¶] If an officer or his agent simply gave the defendant an opportunity to commit the crime or merely tried to gain the defendant's confidence through reasonable and restrained steps, that conduct is not entrapment. [¶] In evaluating this defense, you should focus primarily on the conduct of the officer. However, in deciding whether the officer's conduct was likely to cause a normally law-abiding person to commit this crime, also consider other relevant circumstances, including events that happened before the crime, the defendant's responses to the officer's urging, the seriousness of the crime, and how difficult it would have been for law enforcement

16

argued that defendant was not guilty of the charged offenses because he did not intend to engage in sexual relations with Timmy when he arrived at the sting house. In doing so, counsel acknowledged that defendant said some "inappropriate things" to Timmy, but argued that defendant only said such things as a "Hail Mary" to convince Timmy to meet up with him so he could prevent Timmy from "hook[ing] up" with someone else on Craigslist. In addition, defense counsel suggested that defendant was not guilty of the charged offenses because he was entrapped. Although defense counsel did not specifically mention the defense of entrapment, he argued that the police targeted defendant and "coaxed" him into showing up at the sting house by making him believe that a 13-year-old boy, who was struggling with his sexuality and a friend of defendant's friends, needed help.

B. *Applicable Legal Principles*

Evidence Code section 352 permits the trial court, in its discretion, to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a trial court's decision to exclude evidence under Evidence Code section 352 for abuse of discretion. (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) We reverse for improper exclusion of evidence only if the error has resulted in a miscarriage of justice. In other words, we reverse only if it is reasonably probable that the appellant would have obtained a more favorable result in the absence of the error. (*People v. Callahan* (1999) 74 Cal.App.4th 356, 363.)

---

officers to discover that the crime had been committed. [¶] When deciding whether the defendant was entrapped, consider what a normally law-abiding person would have done in this situation. Do not consider the defendant's particular intentions or character, or whether the defendant had a predisposition to commit the crime. [¶] If the defendant has proved that it is more likely than not that he attempted to commit [the charged crimes] because he was entrapped, you must find him not guilty of [the charged crimes]."

C. *Analysis*

We conclude defendant has failed to show an abuse of discretion or prejudice. The central issues at trial were whether defendant was the person communicating with Timmy with regard to the Craigslist advertisement, whether defendant intended to engage in sexual relations with Timmy when he arrived at the sting house, and whether defendant was entrapped by law enforcement. Hopper's reaction to defendant's arrest at the sting house was not relevant to any of these issues. Stallings (playing the role of Timmy), not Hopper, was the person communicating with defendant about the Craigslist advertisement. There was no evidence that Hopper or anyone else involved in the sting operation knew that defendant was the person communicating with Timmy prior to defendant's arrival at the sting house. As we have described, all evidence was to the contrary. Defendant has made no attempt to explain how Hopper's "gloating" over his arrest was relevant evidence that was erroneously excluded. Moreover, he has made no attempt to show that the trial court's exclusion of evidence was prejudicial, i.e., it is reasonably probable that he would have obtained a more favorable result in the absence of the asserted error. On this record, we see no basis for reversal.

Because we have addressed the merits of defendant's claim, we need not and do not address the People's forfeiture argument.

III

*Larry's Trial Testimony*

Defendant contends the trial court erred by sustaining a hearsay objection and striking certain testimony Larry gave about defendant's state of mind prior to his arrival at the sting house. We conclude any error was harmless.

A. *Additional Background*

The relevant exchange between defense counsel and Larry was as follows:

"Q. All right. Now, I want to direct your attention to June 7 of 2016. Okay?

"A. Yes.

18

"Q. Did you have a telephone conversation with your son, Derek Rudd, that evening.

"A. Yes.

"Q. Do you remember approximately what time that conversation occurred?

"A. My wife and I were getting ready for bed. I think it was around 10 o'clock.

"Q. All right. Can you tell us what the nature of that conversation was?

"A. Derek seemed to be upset, and he was talking to a kid on Facebook. He said that the kid was having some problems, that he thought he was gay, but he also said he couldn't talk to his father because of apparently their relationship."

"[Prosecutor]: Objection. Hearsay.

"The Court: Sustained.

"[Prosecutor]: Move to strike.

"The Court: Stricken."

Immediately after this exchange occurred, defense counsel asked Larry if defendant had expressed concern about the "child's" (i.e., Timmy's) relationship with his father. Thereafter, Larry testified that defendant sounded upset during the phone call and was concerned because Timmy was unable to tell his father that he is gay. Larry further testified that defendant was afraid that Timmy might "do something" and get hurt or something might happen to Timmy, and that defendant wanted to go talk to Timmy to try and "counsel" him. On cross-examination, the prosecutor asked Larry if defendant told him what Timmy was planning on doing. Larry responded as follows: "[Defendant] said that [Timmy] was questioning whether he was gay and that he may be . . . making a decision where he could be . . . injured and [defendant] was trying to help him . . ."

B. *Analysis*

On this record, any evidentiary error was harmless. Even assuming the trial court erred in sustaining the hearsay objection and striking the few lines of challenged testimony, the *same evidence* was subsequently placed before the jury by Larry. Given

19

the strong evidence of defendant's guilt, it is not reasonably probable that defendant would have obtained a more favorable result in the absence of the asserted error. (See *People v. Fudge* (1994) 7 Cal.4th 1075 1103-1104.) In view of our determination that defendant suffered no prejudice from the asserted error, we reject his suggestion that reversal is required due to ineffective assistance of counsel.

IV

*Voir Dire*

Defendant contends the trial court erred in denying his request to use a questionnaire during voir dire containing questions designed to probe the prospective jurors' views regarding homosexuality. According to defendant, "[h]ad the jury been thoroughly questioned with the . . . voir dire [questionnaire], a different result is likely to have occurred." We find no abuse of discretion or prejudice.

A. *Additional Background*

Defendant filed a pretrial motion asking the trial court to use a questionnaire during voir dire containing questions about homosexuality. He argued that a questionnaire was necessary to determine if prospective jurors were biased or prejudiced against homosexuals.

At the hearing on this matter, the trial court initially expressed its general dislike of questionnaires, and that it preferred to ask potential jurors questions in open court where their demeanor could be observed. Thereafter, defense counsel argued that a questionnaire was necessary because there are people with "very strong religious" opinions about homosexuality and it is important to find out whether any prospective jurors have those viewpoints and whether it would impact their ability to be fair and impartial. In making this argument, counsel suggested that prospective jurors might not disclose such viewpoints in open court.

20

The trial court denied defendant's motion, indicating that the prospective jurors' viewpoints on homosexuality could be explored "in live voir dire" and that jurors could speak privately about this issue if necessary.

Following the trial court's initial examination, the parties questioned the prospective jurors at length. During this process, defense counsel was permitted to ask questions about homosexuality, including whether prospective jurors had any moral or religious beliefs that homosexuality is wrong.

B. *Applicable Legal Principles*

" 'There is no constitutional right to voir dire per se. Nor is there any constitutional right to conduct voir dire in a particular manner. [Citation.] Rather, the voir dire process serves as a means of implementing the defendant's Sixth Amendment right to an impartial jury. [Citations.] [¶] Consistent with applicable statutory law, the trial court has wide latitude to decide the questions to be asked on voir dire [citation], and to select the format in which such questioning occurs [citation]. The court likewise has broad discretion to contain voir dire within reasonable limits.' " (*People v. Landry* (2016) 2 Cal.5th 52, 83.)

"To select a fair and impartial jury in a criminal jury trial, the trial judge shall conduct an initial examination of prospective jurors. At the first practical opportunity prior to voir dire, the trial judge shall consider the form and subject matter of voir dire questions. Before voir dire by the trial judge, the parties may submit questions to the trial judge. The trial judge may include additional questions requested by the parties as the trial judge deems proper." (Code Civ. Proc., § 223, subd. (a).) "The trial judge shall, in his or her sound discretion, consider reasonable written questionnaires when requested by counsel. If a questionnaire is utilized, the parties shall be given reasonable time to evaluate the responses to the questionnaires before oral questioning commence." (*Id.*, subd. (e).)

"Upon completion of the trial judge's initial examination, counsel for each party shall have the right to examine, by oral and direct questioning, any of the prospective jurors. The scope of the examination conducted by counsel shall be within reasonable limits prescribed by the trial judge in the judge's sound discretion . . . . During any examination conducted by counsel for the parties, the trial judge shall permit liberal and probing examination calculated to discover bias or prejudice with regard to the circumstances of the particular case or the parties before the court. The fact that a topic has been included in the trial judge's examination shall not preclude appropriate followup questioning in the same area by counsel. The trial judge should permit counsel to conduct voir dire examination without requiring prior submission of the questions unless a particular counsel engages in improper questioning." (Code Civ. Proc., § 223, subd. (b)(1).)

"The trial judge's exercise of discretion in the manner in which voir dire is conducted, including any limitation on the time that will be allowed for direct questioning of prospective jurors by counsel and any determination that a question is not in aid of the exercise of challenges for cause, is not cause for a conviction to be reversed, unless the exercise of that discretion results in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution." (Code Civ. Proc., § 223, subd. (g).)

C. *Analysis*

We conclude defendant has shown neither abuse of discretion nor prejudice. Although the trial court denied defendant's request to provide prospective jurors with a questionnaire containing questions probing their beliefs about homosexuality, defense counsel was permitted to ask questions on this topic during the voir dire process without limitation. Defendant has made no attempt to demonstrate that the way the trial court conducted voir dire resulted in a miscarriage of justice.

## DISPOSITION

The judgment is affirmed.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Mauro, Acting P. J.

_____/s/_____
Krause, J.